# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| VIETNAM VETERANS OF AMERICA, *et al.*, )<br><br>Plaintiffs, )<br><br>v. )<br><br>ROBERT McNAMARA, *et al.*, )<br><br>Defendants. ) | Civil Action No. 02-2123 (RMC) |

## MEMORANDUM OPINION

The Vietnam Veterans of America, along with named and unnamed Vietnam-era veterans, sue former Secretary of Defense Robert McNamara and other named and unnamed officials of the Department of Defense ("DoD") for alleged violations of their rights of access to veterans' benefits. The complaint alleges that the Defendants have committed *Bivens*[1] violations of Plaintiffs' constitutional rights by intentionally concealing and covering up, for decades, the evidence of experiments conducted on Navy and Marine personnel in 1963 and 1964 as part of Project Shipboard Hazard and Defense ("SHAD"). The Defendants are sued in their individual and official capacities.

Pending before the Court are the Individual Defendants' Supplemental Brief on Qualified Immunity ("Defs.' Brief on Immunity") and Plaintiffs' Opposition thereto ("Plts.' Opp. Qualified Immunity"); Plaintiffs' Supplemental Memorandum Regarding Standards for Judicial Review of Government Classification Determinations ("Plts.' Brief on Classification"), the

---

[1] *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

Defendants' Opposition ("Defs.' Opp. on Classification"), and Plaintiffs' Reply ("Pltfs' Reply on Classification"); Plaintiffs' Submission Pursuant to the Court's May 25, 2004 Order (concerning more specific allegations of misconduct by the named Defendants) ("Plts.' Submission re Alleged Misconduct"), the Defendants' Opposition (Defs.' Opp. re Alleged Misconduct), and Plaintiffs' Reply ("Plts.' Reply re Alleged Misconduct); and Plaintiffs' Motion to Alter or Amend Judgment or, in the Alternative, for Leave to File an Amended Complaint (Pltfs.' Motion to Alter Judgment"), Defendants' Response (Defs.' Opp. to Motion to Alter Judgment"), and Plaintiffs' Reply ("Pltfs.' Reply re Motion to Alter Judgment").  Upon consideration of the parties' arguments in briefing and at oral argument, the Court will grant the motion to dismiss the complaint against Defendants Robert McNamara, Dee Dodson Morris, Bernard Rostker, William Winkenwerder, Michael Kilpatrick and John Doesburg.

## BACKGROUND

In 1963 and 1964, the United States military used active-duty servicemen aboard Navy ships in dispersal testing for biological and chemical weapons.[2]  Project SHAD was designed to test the vulnerability of ships to biological or chemical attacks using biological and chemical simulants, tracers, and disinfectants that government and military officials believed were benign. Since at least 1962, the DoD has concealed the true nature of, and potential for, adverse health effects caused by this military testing.  Am. Compl. ¶ 2.[3]  According to Plaintiffs, the federal

---

[2]  The specific background to the complaint is described more fully in the Court's earlier memorandum opinion in this matter, *Vietnam Veterans of Am. Inc. v. McNamara*, 2003 U.S. Dist. Lexis 25840 (September 30, 2003) ("*Vietnam Veterans I*"), and will not be repeated here.

[3]  The facts are taken from the amended complaint and from corroborating statements in the Defendants' briefs, and are assumed to be true for purposes of the pending motions to dismiss.

government collected and documented contemporaneous information regarding veterans' actual exposures but placed this information in classified medical records to which they have denied, and continue to deny, access.  *Id.*[4]

In August 2000, the Department of Veterans Affairs ("VA") asked DoD to provide information concerning Project SHAD tests to help VA adjudicate disability benefit claims filed by SHAD Veterans.  DoD conducted an investigation and, by December 31, 2002, determined that 134 tests had been planned between 1962 and 1973 -- 46 tests were conducted and 62 were cancelled.  *See* Statement of the Hon. William Winkenwerder, Assistant Secretary of Defense for Health Affairs, Before the Senate Armed Services Committee (October 10, 2002).[5]

The DoD investigation led to declassification by the Department of the Army of certain medically-relevant information including, most importantly, identification of the agent or simulant used in each test.  DoD used the declassified information to prepare fact sheets on the SHAD tests, which were provided to VA and posted on a DoD website.[6]  At the end of 2002, DoD had published 46 fact sheets on 42 tests involving more than 5,000 members of the Armed Forces.  DoD separately provided VA with information from ship rosters to identify veterans who had been

---

[4]  The Defendants admit that "the Defense Department's release of information on this was halting and incomplete."  Transcript of April 30, 2003 Hearing ("1st Tr.") at 19.  Plaintiffs retort that officials engaged in "consistent lies and concealment" and charge, *inter alia*, that "rather than say anything that they're classified, the government simply denied that [the test records] exist."  *Id.* at 30; *see also* Am. Compl. ¶¶ 116-125.

[5]  The Winkenwerder Statement is reprinted in Appendix A to the Defendants' [Initial] Motion to Dismiss ("Defs.' 1st Motion").

[6]  *See* http://deploymentlink.osd.mil/current_issues/shad/shad_intro.shtml.

part of the Project SHAD testing.[7]  DoD has *not* released individual medical records concerning test results, if any exist, nor any information concerning levels of exposure.

In their amended complaint, Plaintiffs allege that the Defendants violated their constitutional rights by intentionally concealing and covering up the evidence of Project SHAD experiments for decades, which has inhibited their ability to "meaningfully petition for service-related death and disability claims." Am. Compl. ¶ 4.  Plaintiffs claim that the primary purpose of this alleged deception "was, and remains, to protect the government and Defendants from lawsuits and to avoid government liability for service-connected compensation." *Id*.

## PROCEDURAL HISTORY

The Defendants filed a motion to dismiss arguing that the Court lacked jurisdiction over the claims and that Plaintiffs had failed to state a claim on which relief could be granted.  On September 30, 2003, the Court issued an initial memorandum opinion, granting in part, and denying in part, the Defendants' motion to dismiss.  *See Vietnam Veterans of Am. Inc. v. McNamara*, 2003 U.S. Dist. Lexis 25840 ("*Vietnam Veterans I*").  In its opinion, the Court examined the general right to bring a damages claim for violation of a constitutional right under *Bivens* and the recent exposition of the constitutional "right of access" claim provided in *Christopher v. Harbury*, 536 U.S. 403 (2002).[8]

_____

[7]  VA has established a website providing information for SHAD Veterans.  *See* www1.va.gov/shad/.  It has also developed a Clinical Pocket Guide to assist in the diagnosis and management of patients' health problems associated with Project SHAD and linked its website to the DoD Project SHAD website where the ships associated with SHAD tests are listed and the Test Chart (showing test names/dates/locations, agent/simulant used and investigation status fact sheets) can be obtained.

[8]  In *Christopher* the Supreme Court described two categories of access claims: "claims that systemic official action frustrates a plaintiff or plaintiff class in preparing and filing suits at

After examining the amended complaint, this Court dismissed claims against the VA Defendants because the complaint failed to allege sufficiently that those Defendants interfered with Plaintiffs' access to the VA benefits process. *Vietnam Veterans I*, at *28. By contrast, the allegations against the DoD Defendants, named or unnamed, were "sufficient to meet the requirements that a plaintiff allege an affirmative action by one or more government officials that misled him and interfered with his access to the VA benefits process." *Id.*, at *27.[9]

While *Bivens* actions enable a complainant to seek vindication of constitutional rights, the doctrine of qualified immunity ensures that monetary liability and harassing litigation will not unduly inhibit officials as they discharge their duties. *See Harlow v. Fitzgerald*, 457 U.S. 800, 814

the present time," ("forward-looking" claims), and "cases that cannot now be tried (or tried with all material evidence), no matter what official action may be in the future," ("backward-looking" claims). *Christopher*, 536 U.S. at 404.

[9] In addition to narrowing the field of defendants, *Vietnam Veterans I* parsed the types of viable claims that remained:

> [T]he only plaintiffs with backward-looking claims are those veterans who 1) have experienced an illness or disability that might be connected to exposure from SHAD; and 2) were or have been affirmatively misled with the effect of depriving these veterans from filing and/or successfully prosecuting a legal claim; (3) by an individual defendant or under the orders or directions of an individual defendant.

> [The only plaintiffs] with forward-looking claims are those who 1) have experienced, or may in the future experience, an illness or disability that might be connected to exposure from Project SHAD, and 2) were or have been affirmatively misled by an individual defendant or under the orders or directions of an individual defendant with the effect of (i) depriving the veteran of successfully prosecuting a benefits claim or (ii) depriving the veteran of a future benefits claim relating to SHAD exposure.

*Vietnam Veterans I,* at *30.

(1982) (claims frequently run against the innocent as well as the guilty at a cost to the government official and society as a whole).   In *Vietnam Veterans I*, the Court noted that the parties argued qualified immunity as an "all-or-nothing" proposition.   *Vietnam Veterans I*, at *33.   Because the issue was not adequately briefed, the Court ordered the parties to provide supplemental briefing on the motion to dismiss, specifically addressing the scope of qualified immunity for DoD Defendants.

On May 25, 2004, the Court heard oral argument on the issue of qualified immunity[10] and issued an order that Plaintiffs file more specific allegations of misconduct by the named DoD Defendants that interfered with Plaintiffs' rights of access to veterans' benefits.[11]   Pursuant to that order, Plaintiffs submitted eighty-three supplemental allegations.   The Defendants submitted a response.   The issue of qualified immunity for the individual defendants is now ripe for determination.[12]

---

[10]   At oral argument, the Court also requested additional briefing on the standards for judicial review of government classification determinations.

[11]   There is no heightened pleading requirement in cases involving qualified immunity. *See Crawford-El v. Britton*, 523 U.S. 574, 595 (1998) (rejecting a heightened pleading standard in a case involving qualified immunity and unconstitutional motive); *Currier v. Doran*, 242 F.3d 905, 916 (10th Cir. 2001) (concluding that "this court's heightened pleading requirement cannot survive *Crawford-El*."); *accord Int'l Action Ctr. v. Atcheson*, 365 F.3d 20, 28 (D.C. Cir. 2004) (rejecting a theory of liability for general inaction "mindful" of the hazards of reducing the standard for pleading the deprivation of a constitutional right).   The court may, however, order that a plaintiff reply to the defendant's answer, file a more-definite statement, or put forward some non-conclusory factual allegations and consider such submissions in "resolving the immunity question, which sometimes requires complicated analysis of legal issues." *Crawford-El*, 523 U.S. at 598.

[12]   Qualified immunity is "an *immunity from suit* rather than a mere defense to liability . . . ." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).   As a result, the Supreme Court has repeatedly "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam) (citations omitted).

## LEGAL STANDARD

On a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint may not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 42, 45-46 (1957). A Rule 12(b)(6) motion tests whether the plaintiff has properly stated a claim, not whether the plaintiff will prevail on the merits. *See Glymph v. District of Columbia*, 180 F. Supp. 2d 111, 113 (D.D.C. 2001); FED. R. CIV. P. 12(b)(6). The court must accept as true all of the plaintiff's well-pled factual allegations and draw all reasonable inferences in favor of the plaintiff; however, the court does not need to accept as true the plaintiff's legal conclusions. *See Alexis v. District of Columbia*, 44 F. Supp. 2d 331, 336-37 (D.D.C. 1999); *Judicial Watch, Inc. v. Clinton*, 880 F. Supp. 1, 7 (D.D.C. 1995).

## QUALIFIED IMMUNITY

Under *Bivens*, a plaintiff may bring a damages suit against an official for deprivation of a constitutional right. In such cases, the plaintiff bears the burden of pleading that a constitutional right is at issue, as well as the elements of his claim. *Siegert v. Gilley*, 500 U.S. 226, 227 (1991) ("claim failed at an analytically earlier stage of the inquiry into qualified immunity" because the complaint failed to "state a claim for violation of any rights secured to him under the United States Constitution").

While permitting *Bivens* suits furthers important values by compensating individuals for constitutional violations, *Harlow*, 457 U.S. at 814, and helping to deter public officials from illegal conduct, *Smith v. Wade*, 461 U.S. 30, 36 n.5 (1983), it is an allowance with significant social costs. "[T]here is a strong public interest in protecting public officials from the costs associated with

the defense of damages actions." *Crawford-El v. Britton*, 523 U.S. 574, 590 (1998).  "[T]here is the danger that fear of being sued will 'dampen the ardor of all but the most resolute, or the most irresponsible [public officials], in the unflinching discharge of their duties.'" *Harlow*, 457 U.S. at 814 (quoting *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949)).  Accordingly, the doctrine of qualified immunity has been employed to accommodate the natural tension between preserving the right of citizens to bring damages suits against officials and protecting those officials and society from the costs of litigating insubstantial claims.  *See Anderson v. Creighton,* 483 U.S. 635, 639 (1987) (qualified immunity strikes a balance between vindication of constitutional rights and the need to preserve an official's ability to perform duties effectively).[13]

The balance of societal interests is achieved by shielding public officials from liability for civil damages so long as their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow*, 457 U.S. at 818. "[A]s long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated," federal employees are protected from suit.  *Anderson*, 483 U.S. at 638.

A determination of qualified immunity involves a threshold question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"  *Saucier v. Katz*, 533 U.S. 194, 202 (2001) (citing *Siegert*, 500 U.S. at 232); *see Wilson v. Layne*, 526 U.S. 603, 609 (1999) (a court considering a defense of qualified immunity to a *Bivens* claim must determine if the plaintiff has alleged the deprivation of a

---

[13] "[S]ocial costs include the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office." *Harlow*, 457 U.S. at 814.  Given that the doctrine has developed to accommodate competing social concerns, "[t]he resolution of immunity questions inherently requires a balance between the evils inevitable in any available alternative." *Id.*

constitutional right).   "[I]f a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Saucier*, 533 U.S. at 201; *see Brosseau v. Haugen*, 125 S. Ct. 596, 589 (2004) (reciting the two-step inquiry).

### 1.   Was There a Violation of a Constitutional Right?

A court making this threshold determination should consider the contours of the alleged constitutional right in a deliberate and principled manner.

> In the course of determining whether a constitutional right was violated on the premises alleged, a court might find it necessary to set forth principles which will become the basis for a holding that a right is clearly established. This is the process for the law's elaboration from case to case, and it is one reason for our insisting upon turning to the existence or nonexistence of a constitutional right as the first inquiry. The law might be deprived of this explanation were a court simply to skip ahead to the question whether the law clearly established that the officer's conduct was unlawful in the circumstances of the case.

*Saucier*, 533 U.S. at 281.

In the qualified-immunity context, the right that is claimed must be defined with specificity.  *See Int'l Action Ctr. v. Atcheson*, 365 F.3d 20, 25 (D.C. Cir. 2004) (quoting *Butera v. District of Columbia*, 235 F.3d 637, 646 (D.C. Cir. 2001)) (courts should not define the relevant constitutional right in general terms because doing so could strip the defense of meaning).  "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right" and that the unlawfulness would be "apparent."  *Anderson*, 483 U.S. at 640; *see Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (the very action in question does not have to have been held unlawful); *Moore v. Hartman*, 388 F.3d 871, 876 (D.C. Cir. 2004) (noting the unfairness of holding officials responsible on grounds that they could not anticipate).

While confronting a right-of-access claim involving an alleged cover-up in *Christopher v. Harbury*, the Supreme Court "express[ed] no opinion" on the existence of a constitutional cause of action under *Bivens* for the claim.   536 U.S. at 412, n.6.   Despite this hesitation, the Court suggested that the right of access has a constitutional grounding.   *See Christopher*, 536 U.S. at 415 ("[h]owever unsettled the basis of the constitutional right of access to courts," decisions of the Supreme Court have grounded this right in various constitutional provisions).   In fact, a number of jurisdictions have acknowledged a constitutional right of access in cases involving an attempted "cover-up" by officials.   *See, e.g.*, *Bell v. City of Milwaukee*, 746 F.2d 1205, 1261 (7th Cir. 1984) (planting evidence and contriving a false story "rendered hollow" a right to seek redress); *Vasquez v. Hernandez*, 60 F.3d 325, 328 (7th Cir. 1995) (permitting claim where officials impeded access to courts); *Crowder v. Sinyard*, 884 F.2d 804, 812 (5th Cir. 1989) (concealing information crucial to a person's ability to obtain redress for the purpose of frustrating that right may constitute a constitutional violation); *Barrett v. United States*, 798 F.2d 565, 575 (2d Cir. 1986) (no duty to volunteer information that would inform plaintiff of the existence of a claim, but cannot thwart vindication of a claim by impeding the ability to assert rights effectively).

In *Delew v. Wagner*, 143 F.3d 1219 (9th Cir. 1998), the plaintiffs alleged that police officers covered-up and conspired to cover-up the facts of a fatal traffic accident to shield an officer's wife from liability.   *Id*. at 1221.   They alleged that the officers refrained from performing a blood-alcohol and field sobriety tests, failed to preserve physical evidence, and allowed the person responsible for the death to leave the scene.   *Id.*   On the facts alleged, the Ninth Circuit Court of Appeals found that the defendants had "violated the [plaintiffs' constitutional] right of meaningful access to the courts by covering up the true facts" of the death.   *Id*. at 1222.

In *Swekel v. City of River Rouge*, 119 F.3d 1259 (6th Cir. 1997), the plaintiff alleged that the police, in an attempt to shield a highly-placed officer's son, covered up the facts of an accident by ignoring an officer's report, failing to perform appropriate forensic tests, ignoring anonymous tips, refusing to investigate a link to the officer's son, refusing to interview that officer's son, and failing to disclose to plaintiff the anonymous tips. *Id.* at 1260-61. The Sixth Circuit Court of Appeals examined a litany of right-of-access cases and found that "if a party engages in actions that effectively cover-up [sic] evidence and this action renders a plaintiff's . . . court remedy ineffective, they have violated his right of access to the courts." *Id.* at 1262.

In *Ryland v. Shapiro*, 708 F.2d 967 (5th Cir. 1983), the Fifth Circuit Court of Appeals examined a complaint that alleged that the defendant and a district attorney prevented a full investigation into a murder by cancelling an autopsy, having a death certificate and coroner's report prepared without examination of the body, and by representing to the police that the death was a suicide. *Id.* at 969. The court found that the right of access is protected by the Constitution and is "guaranteed . . . from unlawful interference and deprivations by the state . . . ." *Id.* at 972.

In *Harbury v. Deutch*, 233 F.3d 596 (D.C. Cir. 2000) ("*Harbury I*"), the D.C. Circuit acknowledged that five other circuits have found that "government cover-ups can infringe the right of access to courts." *Id.* at 607. The plaintiff in *Harbury I* alleged that government officials "made 'fraudulent statements and intentional omissions' that prevented her from 'effectively seeking adequate legal redress . . . .'" *Id.* at 600. The D.C. Circuit examined *Ryland*, *Swekel*, and *Delew*, among others, to reach its conclusion that a constitutional violation was alleged. It acknowledged that "'[t]he right to sue and defend in the courts [] is the alternative of force. In an organized society it is the right conservative of all other rights, and lies at the foundation of orderly government. It is

-11-

one of the highest and most essential privileges of citizenship.'" *Id.* at 607 (quoting *Chambers v. Baltimore & Ohio R.R.*, 207 U.S. 142, 148 (1907)). In recognizing a constitutional claim, *Harbury I* described the facts of the case with care, noting that the plaintiff there alleged that the defendants "affirmatively deceived her" by lulling her into believing that they were helping her, "intending to prevent her from suspecting that the U.S. government was actually involved . . . ." *Id.* at 608.

### 3.    Was the Right Clearly Established?

In recognizing a constitutional right of access in cases involving governmental cover-ups, *Harbury I* also determined "that when public officials affirmatively mislead citizens in order to prevent them from filing suit, they violate clearly established constitutional rights and thus enjoy no qualified immunity." *Id*. at 611. *Harbury I* involved a plaintiff who alleged that officials took affirmative steps to mislead her and that these steps thwarted her access to the courts. As a general proposition, the simple fact that *Harbury I* limited its holding to the facts of the case does not, by itself, foreclose the possibility that a less-tailored constitutional right of access might exist and be "clearly established." Indeed, standing alone, *Ryland*, *Swekel*, *Delew*, and *Harbury I* could easily support the broader proposition that it is a violation of a constitutional right for an official, through affirmative action, to cover up misconduct to impede access to the courts, rather than the more-narrow proposition that it is a constitutional violation to "affirmatively mislead citizens for the purpose" of preventing lawsuits. *Id.* Such a reading would be consistent with the caution expressed by the Supreme Court in *Saucier* against formulaic scrutiny of qualified immunity claims. *See Saucier*, 533 U.S. at 202 (an "officer would not be entitled to qualified immunity based simply on the argument that courts had not agreed on one verbal formulation of the controlling standard").

On petition for rehearing, however, the D.C. Circuit used the opportunity to clarify and limit *Harbury I*.  In *Harbury v. Deutch*, 244 F.3d 956 (D.C. Cir. 2001) (per curiam) ("*Harbury II*"), the government argued that *Harbury I* marked a significant and dangerous expansion of the constitutional right of access.  The D.C. Circuit placated such concerns by declaring that its earlier decision "explicitly and repeatedly limits its holding to situations where -- as Harbury alleges -- defendants both affirmatively mislead plaintiffs *and* do so for the very purpose of protecting government officials from suit."  *Id*. at 957 (emphasis in original).  Although even this statement does not foreclose a time when a broader right of access may be recognized as being clearly established, it indicates in no uncertain terms that the only right of access in cases involving an attempted cover-up that our Circuit currently considers to be "clearly established" is the right not to be affirmatively misled for the purpose of protecting government officials from suit.  *Id.*

The D.C. Circuit further defined and tailored the contours of the right of access in *Harbury II*.  It proposed that the courts would not be open "to a flood of constitutional access to courts claims" because, as a procedural matter, plaintiffs are required to "press their underlying claims to ensure that the alleged cover-ups in fact prejudiced their ability to seek relief."  *Id.*  "Moreover, as a substantive matter, [*Harbury I*] distinguishes Harbury's situation from those where a plaintiff, despite a cover-up, has enough information to file a 'John Doe' suit . . . [but the court] expresse[d] no view on the constitutionality of cover-ups that do not 'conceal[] most of the essential facts' of a cause of action until bringing it would be 'futile'"  *Id.* (citations omitted).

It is against this legal framework that Plaintiffs' complaint allegations and the supplemental allegations of misconduct must be measured.

-13-

## ALLEGATIONS

Because the qualified-immunity inquiry is an individualized one, the allegations against each defendant must be scrutinized. *See Harlow*, 457 U.S. at 819 (pertinent inquiry is into the "reasonableness of an official's acts"); *Poe v. Leonard*, 282 F.3d 123, 134 (2d Cir. 2002) ("qualified immunity analysis depends upon an individualized determination of the misconduct alleged"); *Cunningham v. Gates*, 229 F.3d 1271 (9th Cir. 2000) (the qualified immunity determination requires that a court "carefully examine the specific allegations against each individual defendant").

### 1.    *Complaint Allegations*

Plaintiffs paint with broad brush strokes an image of a widespread and systematic cover-up of Project SHAD, including calculated efforts to conceal and withhold medical records and other relevant information dealing with the adverse health effects of those experiments.  Their complaint refers liberally to efforts by "government and military officials" to advance this cover-up, but fails to identify these officials by name.  Am. Compl. ¶¶ 4, 40, 42, 44, 45, 47, 48, 49, 56, 57, 58, 59, 61, 76, 86, 99, 100, 101, 104, 119, 131, 135, and 171.  In some instances, the term "government and military officials" is qualified to "include[] Defendants."  *Id*. ¶¶ 98, 100, 105, 134, 164, 165, 166, 176, 177, and 180.  In yet other instances, the complaint refers only to "Defendants" both named and unnamed.  *Id*. ¶¶ 2, 3, 4, 5, 41, 136, 169, 170, 181, 182, 183, 184, 185, 191, 192, 193, 195, 196, 197, 206, 207, 208, 209, 210, 212, 213, 214, 215, 219, 220, 223, 224, 225, 228, 229, 230, 231, 232, 233, 237, 238, 239, 240, 241.  Plaintiffs refer to actions and inactions by non-defendants in various positions at DoD.  *Id*. ¶ 118 (Director, Space and Special Weapons); 121, 122, 123, 125, 126,  (U.S. Army Chief, Special Actions Branch); 124 (U.S. Army officer); and 127 (Assistant Secretary of

Defense for Public Affairs).  Indeed, compared to the number of paragraphs in the complaint, it is only in the rare instance that Plaintiffs identify any of the DoD Defendants by name, let alone allege any wrongdoing on their part.  *Id.* ¶¶ 30, 31, 32, 33, 38, 39, 46, 47, 97, 115, 117, 120, 129, 137, 138, 139, 140, 141, 142, 143, 144, 145, 148, 149, 152, 153, 155, 157, 167, 172, 205, 217, 227, 235, and 236.  For clarity in the analysis, the complaint allegations of wrongdoing by named DoD Defendants are summarized below.

The Complaint alleges that Defendants McNamara, Doesburg, Rostker, Winkenwerder, Morris, and Kilpatrick: 1) "improperly ordered, maintained, and continue to maintain, medical information," *id.* ¶ 97; 2) "misused, and continue to misuse, military classification and national security processes to prevent and obstruct releasing Project 112 and Project SHAD information that may prove unpopular, controversial, or embarrassing," *id.* ¶ 172; 3) "rejected, or caused rejection of, Plaintiffs' past claims for service-connected death and disability compensation by improperly withholding and concealing . . . relevant . . . information and producing knowingly false statements regarding Project 112 and Project SHAD activities," *id.* ¶ 217; 4) "agreed to, and did, perform actions and cause others to perform actions and inactions, implement policies and procedures and illegally withhold relevant . . . information from Plaintiffs for the unlawful purpose of denying Plaintiffs access to the courts and to prevent Plaintiffs from obtaining redress from the government for their service-connected grievances," *id.* ¶ 227; and 5) "knew or should have known other persons had agreed to, and did, perform actions and cause others to perform actions and inactions, implement policies and procedures, and illegally withhold relevant . . . exposure information from Plaintiffs for the unlawful purpose of denying Plaintiffs access to the courts and to prevent [them] from obtaining redress from the government for their service-connected

grievances," *id*. ¶ 235.

Allegedly, Defendants Doesburg, Rostker, Winkenwerder, Morris and Kilpatrick: 1) "provided, and continue to provide false information and concealed, and continue to conceal, true information, knowing that such information would be used to deny legitimate benefit claims by SHAD Veterans and, thereby, caused, and continue to cause, a permanent loss of the denied benefits," *id*. ¶ 115; 2) "refused, and continue to refuse, to provide VA with medical information . . . and had, until recently, falsely denied even the existence of such information," *id*. ¶ 117; and 3) "knew or should have known, that information in improperly classified special medical records . . . contain information necessary for Plaintiffs to obtain statutory government benefits or to adequately, effectively, and meaningfully access the courts and administrative agencies," *id*. ¶ 205.

Further, the amended complaint alleges that Defendants Rostker, Kilpatrick, Winkenwerder, and Morris developed and defended the position that there are no known adverse health effects to certain chemical agents. *Id*. ¶ 153. Defendants Kilpatrick, Winkenwerder, and Morris allegedly "refused to interview, and have not interviewed, any crew members of any ship involved in Project SHAD." *Id*. ¶ 143. Defendants Winkenwerder and Morris are alleged to have failed to release or identify for future release any service medical record or any health information despite repeated public statements to the contrary. *Id*. ¶ 145. Defendant Morris is alleged to have admitted that the Army had recorded some infections but no deaths during the testing. *Id*. ¶¶ 142, 149. As to Defendant Doesburg, he is alleged to have "falsely stated that individuals used as test subjects in Project SHAD 'were afforded safety equipment and other safety precautions'" in a June 17, 1994 letter to a member of Congress.   *Id*. ¶ 120. Defendant Rostker, in an October 2, 2000 memorandum for the Secretary of Defense, allegedly "admitted that 'DoD has received several

information requests over the past ten years on behalf of various veterans concerned that they might have been exposed to something during [SHAD] tests that caused their health problems.'" *Id.* ¶ 129.

Plaintiffs further allege that Defendant Winkenwerder: 1) publicly stated on July 9, 2002 "that DoD was 'committed to providing the [VA] with medically relevant information regarding veteran's exposures during the Project SHAD experiments 'as quickly and efficiently as possible,'" *id.* ¶ 138; 2) gave testimony to the Senate Committee on Veterans' Affairs on July 10, 2002 and stated that "investigators were 'comb[ing] through' documents 'to identify the medically relevant data,'" *id.* ¶ 139; 3) publically stated on August 13, 2002 that declassification of medically relevant information was under way and that medically relevant information would be made available to the public, *id.* ¶ 140; 4) on October 9, 2002, gave testimony that his investigators would identify medically relevant information and expedite the process for declassification, *id.* ¶ 141; and 5) announced the completion of the investigation by admitting experiments and the number of veterans used during testing, *id.* ¶ 144.

### 2. More Specific Allegations of Misconduct

In compliance with the Court's Order, Plaintiffs filed more specific allegations of misconduct by the named DoD Defendants.

### A. Dee Dodson Morris

Plaintiffs allege that Bernard Rostker, former Under Secretary of the Army and Special Assistant to the Deputy Secretary of Defense for Gulf War Illnesses, appointed Dee Dodson Morris on or about October 20, 2000, as the point person at DoD through whom VA officials could obtain information regarding Project SHAD. Ms. Morris was tasked with answering an August 3, 2000, request from the Acting Secretary of Veterans Affairs for "the level of exposure and method

used to determine the level of exposure experienced by" SHAD veterans.  Plts.' Submission re Alleged Misconduct ¶¶ A.1-2.  On October 5, 2000, Ms. Morris allegedly made a series of false or misleading statements to VA officials concerning Project SHAD, its subjects, and the effort to develop full information.  *Id.* ¶¶ A.3-9. On October 12, 2000, the VA sent Ms. Morris a document indicating the "kind of information" that VA would "need to process claims" for benefits from SHAD veterans, which included "[e]xposure level and how measured" and '[p]rotective gear worn, if any."  *Id.* ¶ A.11.  Thereafter, Ms. Morris is alleged to have informed the VA and a SHAD Interagency Group that information was being developed and would be released when, in fact, she had "actual knowledge" that she already had much of the information, none of which she ever released.  *Id.* ¶¶ A.13-17, 20 - 29.  Ms. Morris is alleged to have developed fact sheets concerning Project SHAD that contained false and misleading information and also to have "falsely stated in response to specific VA inquiries that her organization did not possess a database of SHAD Veterans including Social Security numbers when she had actual knowledge that her organization did have such a database."  *Id.* ¶¶ A.18, 29.

In addition, Ms. Morris is alleged to have made a series of misleading and false statements to the media concerning her investigation into Project SHAD.  *Id.* ¶¶ A.30-33.  In all, Ms. Morris is alleged to have failed to provide complete, accurate and truthful information despite her lengthy investigation.

## B.   *Bernard Rostker*

As Under Secretary of the Army, Mr. Rostker is alleged to have "willfully ignored" a 1997 request to declassify Project SHAD records, *id.* ¶ B.2; "knowingly approved the intentional concealment of . . . human dose information," *id.* ¶ B.3; "directed defendant Morris to falsely state"

that DoD would be responsive to VA needs for information on SHAD, *id.* ¶B.4; falsely stated to a veteran's representative and to a Senator that DoD was committed to reporting on Project SHAD, *id.* ¶ B.5; "intentionally and affirmatively blocked transmittal from the DoD/Army to VA of medically relevant information" on SHAD, *id.* ¶ B.6; "affirmatively blocked notification to SHAD Veterans of their possible exposure," *id.* ¶ B.8; and "ordered termination of all SHAD information exchange with VA and SHAD veterans." *Id.* ¶ B.9.

### C.     *William Winkenwerder*

Mr. Winkenwerder has been the Assistant Secretary of Defense for Health Affairs. Mr. Winkenwerder is alleged to have "knowingly approved continued concealment from and the affirmative misleading of SHAD Veterans, including Plaintiffs, regarding the existence of the human dose information that was in the possession and control of his subordinates." *Id*. ¶ C.1. Plaintiffs assert that Mr. Winkenwerder submitted false or misleading testimony to the Senate Armed Services Committee concerning DoD activities in regard to Project SHAD and also "falsely stated" that DoD had identified all the available medically relevant information from documents that had been declassified and made available to veterans. *Id.* ¶¶ C.3-12. Despite "repeated intentionally false and misleading statements [by Mr. Winkenwerder] to VA officials, members of Congress and SHAD Veterans, including Plaintiffs, that these specific documents, as well as others, were being, or had already been, declassified," Army counsel informed counsel for Plaintiffs on January 27, 2004, that declassification efforts were just beginning. *Id.* ¶ C.15 (Army counsel had just "'got the declassification review rolling on three tests'" that had been conducted as part of Project SHAD.).

D.       *Michael Kilpatrick*

Michael Kilpatrick was the Deputy Director for the Deployment and Health Support Directorate at DoD and the direct supervisor of Ms. Morris.  *Id.* ¶ D.1.  He is alleged to have misled the SHAD Interagency group with false statements concerning the level of information available to DoD and also to have "directed that letters should <u>not</u> be sent to individual SHAD Veterans informing them of potential health effects."  *Id.* ¶¶ D.3-4.  Mr. Kilpatrick is also alleged to have ordered, in May 2001, that "all SHAD information in the possession of his subordinates [be] collected and quarantined and information exchanges with VA and SHAD Veterans terminated." *Id.* ¶ D.5.  Mr. Kilpatrick assured the public that he was committed to a full and open investigation of the SHAD tests but has refused (i) to allow VA to verify the accuracy of SHAD information or (ii) to release such information to anyone outside VA because it has not been declassified.  *Id.* ¶¶ D.6 - 8.  Despite public statements that DoD "'investigators were searching for information that would help VA provide health care,'" Mr. Kilpatrick allegedly has personal knowledge that such information exists and is being withheld. *Id.* ¶ D.10.

E.       *John Doesburg*

General Doesburg is in charge of the Army's biological and chemical warfare command with control over the Deseret Test Center at Dougway Proving Ground.  Transcript of May 28, 2005 Hearing ("2d Tr.") at 39-40.  Plaintiffs state that General Doesburg is the custodian of the records that they are trying to obtain.  Plaintiffs allege that General Doesburg personally reviewed and approved publication of knowingly false and misleading information about Project SHAD to inquiries from the Congress and from VA, such as the false statement in 1995 that SHAD Veterans were afforded safety equipment and other safety precautions.  Am. Compl. ¶ 120.  They insist that

General Doesburg affirmatively acted to approve intentional concealment of human dose information in response to the August 2000 request for exposure data from VA.  Plts.' Submission re Alleged Misconduct ¶ E.7.  General Doesburg allegedly continues to act affirmatively to block requests from SHAD Veterans to declassify medically relevant SHAD information.  *Id*.

Plaintiffs allege that General Doesburg has personally reviewed and approved, and affirmatively authorized, the publication of knowingly false and misleading information about Project SHAD in response to inquiries from VA and Congress.  *Id.* ¶ E.3.  At a meeting in 1995 convened in response to inquiries from SHAD Veterans, including some of the plaintiffs, General Doesburg is alleged to have made "affirmative misleading statements concealing the exposures and true nature of SHAD experiments to VA officials."  *Id.* ¶ E.5.  In response to the August 2000 request for information from the Acting Secretary of Veterans Affairs, General Doesburg is alleged to have "affirmatively approved the intentional concealment of the human dose information that was in the possession and control" of DoD.  *Id.* ¶ D.7.  Finally, General Doesburg is alleged to continue to "willfully ignore and affirmatively act to block" requests from VA officials, SHAD Veterans including Plaintiffs, and Members of Congress to declassify medically-relevant SHAD information.  *Id.* ¶ D.8.

## ANALYSIS

There is no longer any dispute: Navy and Marine personnel were used as human samplers without their knowledge during Project SHAD.  The amended complaint alleges that SHAD Veterans applied for, and were denied, VA benefits because there was no evidence of a service connection between their health problems and their service.  The amended complaint alleges that VA repeatedly sought information from DoD concerning the veterans' service without success.

At first DoD said that no tests were ever conducted.  Over the years, it has insisted that the military personnel wore protective clothing, that no harmful substances were used, and that no records existed.  These statements were all false.  DoD did not provide any information on Project SHAD until the fact sheets were issued in 2000 and 2001.  As a result, the amended complaint alleges that SHAD Veterans have been denied VA benefits and/or have failed to file for benefits.

For these reasons, the Court concluded in *Vietnam Veterans I* that Plaintiffs have sufficiently alleged a violation of their constitutional rights of access to the VA benefits process through repeated false and misleading statements from DoD.  The question at issue here, however, is more precise.  Did any of the *named* DoD Defendants -- sued in their individual capacities for money damages under *Bivens* -- make any "affirmative" false statements that interfered with Plaintiffs' rights of access to VA benefits?

### 1.    *Were Plaintiffs' Rights of Access Foreclosed?*

The Defendants assert that Plaintiffs cannot meet certain standards established in the *Harbury* cases to continue a suit asserting a violation of the right of access to the courts or, as here, an administrative agency.[14]   Specifically, they argue that Plaintiffs have not shown that their rights of access were foreclosed or prejudiced by Defendants' actions because: A) most plaintiffs have not sought benefits in the past; B) DoD has released fact sheets that disclose pertinent information; and C) any information not disclosed is not necessary for access to the claims process.  The Court disagrees.

---

[14]    The right of access extends to proceedings before administrative agencies as well as courts.  *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972).

A.    *Plaintiffs Have Sought Benefits*

The Defendants begin with the argument that the decision in *Harbury II*, denying the government's petition for rehearing, imposed a requirement that a plaintiff "must first press her underlying claims to ensure that the alleged cover-up in fact prejudiced her ability to seek her relief." *Harbury II*, 244 F.3d at 957. Because nineteen (19) of the twenty-one (21) named Plaintiffs have either never presented claims to the VA or never had claims denied, the Defendants argue that only plaintiffs Bates and Druckemiller have even attempted to meet this first standard from *Harbury II*.

The Court disagrees. The amended complaint adequately alleges that some SHAD Veterans in the putative class, including Messrs. Bates and Druckemiller, have applied for benefits and had benefits denied because DoD would not release medical information to VA.

Beyond this question of fact, *Harbury II* also permits an access-to-courts claim when a plaintiff pleads that "defendants' actions 'completely foreclosed' one of her primary avenues of relief" and that a plaintiff did not have "enough information to file a 'John Doe' suit." *Id.* The instant lawsuit *is* a "John Doe" suit, based on the development of limited information concerning DoD's admittedly-delayed and incomplete disclosure of information about Project SHAD. Plaintiffs allege specifically that the named Defendants, and the unnamed John Does, completely foreclosed their applications for VA benefits because DoD refused to acknowledge that the SHAD testing even occurred, much less that it might have affected the health of the Navy and Marine personnel who were its unwitting subjects. These allegations provide "sufficient information to allow a party to 'frame a responsive pleading'" and "is all the federal rules require." *Id.*

B.      *Release of Fact Sheets Was Not Sufficiently Remedial*

The Defendants resist the conclusion that Plaintiffs' claims were or are "completely foreclosed" as *Harbury II* requires.  Since DoD released fact sheets on September 13, 2001 and January 31, 2002, that "accurately identif[ied] the two simulants and one disinfectant to which any of the Plaintiffs may have been exposed . . . [and] [t]he fact sheets and the Personnel Roster for each ship that participated in [SHAD] testing have been provided to VA," Defendants assert that VA now has sufficient information to approve benefits for SHAD Veterans who otherwise meet VA standards. Defs.' Opp. re Alleged Misconduct at 4.

Once again, the Court disagrees.  As an initial matter, the Defendants disingenuously gloss over the allegation that SHAD Veterans and VA have been seeking information on Project SHAD for decades and that any partial release of information did not occur until 2001-2002.  More importantly, Plaintiffs argue that VA benefits cannot be awarded retroactively, but only prospectively from the date the claim is filed.  *See* 38 U.S.C. § 5110(a).[15]  Thus, Plaintiffs and members of the class they seek to represent have been "completely foreclosed" from seeking benefits during the years of DoD's alleged cover-up prior to 2001 and 2002.

The Defendants agree that 38 U.S.C. § 5110(a) generally limits retroactive awards. However, they point to the specific exception in 38 C.F.R. §§ 3.156(c) and 3.400(a)(2), which provide for retroactive payments when a claim is reopened and granted based on new and material evidence from a military service department. *See Spencer v. Brown*, 4 Vet. App. 283, 293 (1993),

---

[15]  38 U.S.C. § 5110(a) states: "Unless specifically provided otherwise in this chapter, the effective date of an award based on an original claim, a claim reopened after final adjudication, or a claim for increase, of compensation, dependency and indemnity compensation, or pension, shall be fixed in accordance with the facts found, but shall not be earlier than the date of receipt of application therefor."

*aff'd*, 17 F.3d 368 (Fed. Cir. 1994) ("[W]here the claim is reopened on the basis of new and material evidence from service department reports, the VA has consistently treated it as a true 'reopening' of the original claim and a review of the former disposition in light of the service department reports which were considered to have been lost or mislaid, and the award of benefits is made retroactive to the date of the original claim . . . .").

Because this Court is without jurisdiction to address issues relating to benefit claims, it concludes only that there is a possibility -- but not a certainty -- that some persons among Plaintiffs or the veterans they seek to represent might receive retroactive benefits if the VA determined that DoD's fact sheets provide sufficient information to reach a determination on benefits for a claim earlier denied. There may well be other SHAD veterans who never connected an illness with the SHAD tests because DoD denied even the fact of the tests. Accordingly, the Defendants' argument that late release of information is sufficiently remedial must fail.[16]

---

[16] Plaintiffs assert that officials at DoD, including the named individual defendants, have consistently spread false information that interfered with their rights to obtain VA benefits

> Within the past four years, defendants' position regarding Project SHAD has eroded in the following sequence: (1) No project occurred; (2) No harmful materials were used; (3) No human exposures occurred; (4) No intentional human exposures occurred; (5) No human dose information exists; (6) No unclassified human dose information exists; (7) No judicial authority exists to determine if the dose information is properly classified; and, most recently, (8) No need to review whether the human dose information is properly classified.

Pltfs.' Reply on Classification at 1. These shifts in position are reflected in the record. Remembering that the Defendants have filed a motion to dismiss prior to any discovery and with all inferences drawn from the amended complaint in Plaintiffs' favor, the Court cannot conclude that the release of fact sheets on Project SHAD testing in 2001 and 2002 is a complete answer to the allegations.

C.      *Undisclosed Information May Be Needed for Claims Process*

The Defendants further argue that the information still unavailable on Project SHAD -- classified service medical records, "exposure data," and human dose information -- has not been shown to be necessary for the determination of SHAD-related VA benefits claims. Defs.' Opp. re Alleged Misconduct at 5-9.   *Harbury* established a "but for" test to be applied in these circumstances, which Plaintiffs allegedly fail: "but for" the affirmative misstatement, a plaintiff could vindicate his rights. *See Harbury I*, 233 F.3d at 609; *Harbury II*, 244 F.3d at 957.  Relying on these decisions, the Defendants assert that there is no evidence that the information that is admittedly withheld is necessary to the VA benefits process.

This argument is difficult to accept under the circumstances of a motion to dismiss, when all inferences must be drawn in the non-movant's favor.  At least twice, VA specifically told DoD that it needed "exposure" information to process benefit claims from SHAD Veterans.  The Defendants' assertion to the contrary has no record support. In fact, the Defendants eventually acknowledge VA's specific requests for information on exposure and rate of exposure, but seek to avoid this uncomfortable fact by noting that the requests were made prior to the release of the SHAD fact sheets in 2000 and 2001.

VA told DoD that it needed exposure information to process SHAD Veterans' claims and DoD had an obligation to provide VA with information necessary to rule on benefit claims.  *See* 38 U.S.C. § 5106 ("The head of any Federal department of agency" – *including* the Secretary of Defense – "shall provide such information to the Secretary [of Veterans Affairs] as the Secretary may request for purposes of determining eligibility for or amount of benefits, or verifying other information with respect thereto.").  The Defendants *admit* that this information is still being

withheld, but argue it is not "necessary" because veterans are not entitled to "every shred of evidence." Defs.' Opp. re Alleged Misconduct at 8. This argument is fundamentally troubling to the Court and is rejected. Decisions on veterans' benefits are in the exclusive domain of the Secretary of Veterans' Affairs and only the VA Secretary can determine what is needed to administer the program. DoD is without authority to decide what information is relevant. If certain information is classified, DoD needs to address that issue in a more straight-forward way. Instead, DoD for years insisted that the medical information on SHAD testing did not exist rather than admitting its existence and stating that it was classified.

> 2.      *Did the Defendants Affirmatively Mislead Plaintiffs?*

The difficult issue to which this case devolves is whether any of the named Defendants can be said to have affirmatively misled any of these Plaintiffs.

While Plaintiffs allege that the Defendants misled Congress, the public at large, or the VA, neither the complaint nor its supplement contends that any individual Plaintiff was specifically misled. The amended complaint contains a single paragraph that could reasonably be construed as an allegation that certain named Defendants made affirmatively misleading statements.

> Defendants Doesburg, Rostker, Winkenwerder, Morris, Kilpatrick, unknown others, and their predecessors, *provided, and continue to provide false information* and concealed, and continue to conceal, true information, knowing that such information would be used to deny legitimate benefit claims by SHAD Veterans and, thereby, caused, and continue to cause, a permanent loss of the denied benefits.

Am. Compl. ¶ 115 (emphasis added). This allegation, however, does not specify to whom such false information was provided. A number of supplemental allegations are similarly deficient. Accordingly, the Defendants argue that Plaintiffs have failed completely to allege a

misrepresentation or act of concealment that actually reached them.[17]

The Court concludes that although VA acts for itself -- to fulfill its statutory and regulatory duties -- it also acts as an agent for service men and women when the VA asks DoD for information from a military service record to allow it to review a claim for benefits. Therefore, even though these Plaintiffs did not individually hear or receive the less-than-straightforward information from DoD, their agent did. This misinformation either denied or delayed the VA an opportunity to assess the veterans' applications for benefits and is sufficient under the standards espoused in *Harbury*.

Plaintiffs' allegations fail nevertheless because they do not allege that these individual Defendants were affirmatively misleading in a manner and at a time that would improperly delay or deny Plaintiffs' access to the claims process. As noted above, the single paragraph in the amended complaint that might allege affirmatively-misleading conduct fails under *Harbury* because it does not claim that such false information was disseminated in a manner that would have reached the Plaintiffs. While the supplemental allegations of misconduct contain more specific allegations supporting the assertion that individual Defendants may have affirmatively misled Plaintiffs or the VA, the alleged misconduct is much more recent than the long history of DoD dissembling that is described in the amended complaint. The supplemental allegations against

---

[17] The Defendants also argue that none of the Plaintiffs could have been misled by the failure of DoD to acknowledge the fact that PROJECT SHAD tests did take place and that servicemen were exposed because, having been there, Plaintiffs all knew the truth. This argument offends the Court's sensibilities and is ultimately irrelevant. Plaintiffs had no knowledge that they had been human testers for dispersal testing on Navy ships with substances that were not benign. In addition, their claim is that DoD's refusal to supply necessary medical information has interfered with their access to VA benefits, *not* that the false information, *per se*, injured them.

these Defendants do not disclose a cover-up of Project SHAD.  Indeed, Project SHAD was already a matter of public discussion and congressional investigation during most of the dates contained in the supplemental allegations.  Instead, the supplemental allegations merely support the claim that these individual Defendants may have failed to work hard to develop information on Project SHAD in 2000-2001 when they said that they were.

Whatever the degree of effort, the basic allegations of affirmatively misleading conduct indicates only that the individual Defendants delayed providing Project SHAD medical records and human dosage information, even though that information was allegedly available.[18]  This delay, while not laudable, is explicable.   Release of Project SHAD information required declassification and the preparation of fact sheets containing unclassified information.   DoD continues to withhold exposure information because it remains classified and DoD asserts it could be used to harm U.S. Armed Forces.  In other words, the Defendants admit that they have not released exposure data but, unlike the past, they are now frankly taking the position that such information is classified.

The Supreme Court counsels against extending *Bivens* into new areas, *Sosa v. Alvarez-Machain*, 124 S. Ct. 2739, 2772 (2004), especially when Congress has established an alternative legal remedy, even if the alternative would not provide a remedy that matches a *Bivens*

---

[18]   Former Secretary of Defense Robert McNamara must be dismissed for more basic reasons.  The Court notes that Mr. McNamara was Secretary of Defense from January 1961 until February 1968.  At least until 1973, government and military officials believed the substances used during SHAD testing were benign.  Am. Compl. ¶ 57.  Accordingly, he could not have acted, through affirmatively-misleading conduct or otherwise, to hinder Plaintiffs' access to the claims process.  In addition, the nature of the constitutional right of access was not developed at the time that Secretary McNamara completed his government service.  Therefore, he would be immune from suit because the constitutional right was not "clearly established" at that time.

suit. *Bush v. Lucas*, 462 U.S. 367, 386-88 (1983). With the release of the fact sheets, prior to the filing of this suit, the DoD has publically acknowledged that the testing occurred in 1963 and 1964, has identified the ships and ships' crews that were involved, and has identified the agents used in the testing. What has not been released is exposure information, which the Army finally told Plaintiffs in 2004 (during unsuccessful settlement discussions) is not subject to release because it is classified. *See* 2d Tr. at 48 (In a communication between counsel, Plaintiffs were told that "the official position [of DoD] was that these documents are classified . . . , it hasn't been released [because it] is classified and it can't be released.").

At oral argument on May 25, 2004 (after years of trying to access information on Project SHAD and two years of litigation), Defendants' counsel informed the court that Plaintiffs' Exhibit 1, admitted at the May 25, 2004, motions hearing is missing a chart that is:

> a dosage or readings that were taken from devices called impingers that are placed throughout the ship to determine whether or not the chemicals leaked or reached these devices . . . [T]hat's one of [the] reasons why this information is classified because the purpose of these tests was to determine biological and chemical weapons capabilities and also defenses . . . [The] defense department doesn't want information about what chemicals can seep where on the ship floating around.

2d Tr. at 53-54. In light of DoD's release of information about Project SHAD, albeit tardy, this case now concerns a request for specific documents: those pages that show dispersal rates on the kinds of Project SHAD reports exemplified by Exhibit 1 and described by defense counsel. The appropriate mechanism for obtaining this documentation is the Freedom of Information Act (FOIA), 5 U.S.C. § 552, not a *Bivens* suit.

## CONCLUSION

The qualified immunity determination is fraught with challenges of a procedural and philosophical nature.  A court must satisfy the clear mandate of the Supreme Court to resolve these issues at an early stage of litigation because a failure to do so eviscerates the considerations that shaped the doctrine.  *Mitchell*, 472 U.S. at 526.  However, summary or mechanical application of qualified immunity without an appropriate review of the factual and legal underpinnings of the specific qualified immunity claim may improperly foreclose a meritorious claim.

Plaintiffs point to these named Defendants with good reason.  These individuals were in a position to classify and conceal this information from the public eye and keep it from reaching SHAD veterans.  But liability for damages under *Bivens* cannot be premised on status or position alone because qualified immunity is defeated only upon a showing that the individual federal official affirmatively misled a plaintiff for the purpose of avoiding suit.

Because the specific allegations against the individual Defendants here are too recent to constitute the affirmative misconduct that interfered with SHAD Veterans' rights to VA benefits, and because there is an alternative means of legal redress concerning the identified documents that continue to be withheld, the Court will dismiss the complaint against the individual Defendants.  Outstanding motions that have not been specifically addressed are denied.

A separate order accompanies this memorandum opinion.

DATE:   February 17, 2005.                              /s/ _____
                                                        ROSEMARY M. COLLYER
                                                        United States District Judge